# Exhibit 5

FILED
TONI L. HELLON
CLERK, SUPERIOR COURT
12/22/2017 1:57:29 PM
BY: ALAN WALKER
DEPUTY

Case No. C20175978
HON. LESLIE MILLER

MESCH CLARK ROTHSCHILD
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mcrawford@mcrazlaw.com
By: Michael J. Crawford, # 13802
96126-1/lav
Attorneys for Plaintiffs

ARIZONA SUPERIOR COURT

PIMA COUNTY

| | |
|---|---|
| ANTOINETTE WINDHURST, a single/widowed woman on behalf of herself and as Personal Representative of the Estate of her deceased husband, DAVID WINDHURST,<br><br>Plaintiffs,<br><br>-vs-<br><br>ARIZONA DEPARTMENT OF CORRECTIONS, a governmental entity; CHARLES RYAN, in his individual capacity as the Director of Arizona Department of Corrections; STATE OF ARIZONA, a governmental entity; CORIZON HEALTH, INC., a business domiciled in Arizona; and JOHN DOES and JANE DOES 1-10, married couples; ABC PARTNERSHIPS 11-20; and/or XYZ CORPORATIONS 21-30, fictitious entities,<br><br>Defendants. | No.<br><br>**COMPLAINT**<br>**(Wrongful Death; Medical Malpractice; Adult Protective Service Act/A.R.S. §46-451, et seq.)**<br><br>**(Jury Trial Requested)**<br><br>(Honorable ____________________) |

Plaintiffs, for their complaint, allege as follows:

**THE PLAINTIFFS**

1. David Windhurst ("David"), age 56 (DOB: 6/24/1960) died on December 25, 2016, in Pima County, Arizona.

2. Antoinette Budnick Windhurst was married to David Windhurst at the time of David's death on December 25, 2016.

3. On December 6, 2017, the Maricopa County Superior Court in Case No. PB2017-001475 appointed Antoinette Windhurst as Personal Representative of David Windhurst's estate.

4. At the time of his death, David Windhurst was a resident of Pima County, Arizona, residing in the Arizona State Prison Complex in Tucson ("ASPC-T").

**THE DEFENDANTS**

5. Defendant Charles Ryan is the Director of the Arizona Department of Corrections.

6. Defendant Charles Ryan is a resident of Maricopa County, Arizona.

7. Defendants State of Arizona and the Arizona Department of Corrections are governmental entities that provided healthcare to David Windhurst either through direct employment of medical clinical personnel and/or through its contract with Corizon Health, Inc. and/or contracts with other healthcare providers.

8. Defendant Corizon Health, Inc., conducted business in Arizona and provided healthcare to David Windhurst through its agents and employees.

**JURISDICTION**

9. The substantial majority of the events giving rise to this Complaint occurred in Pima County, Arizona.

10. This matter exceeds the applicable compulsory arbitration limits such that it is <u>not</u> subject to compulsory arbitration.

11. Plaintiffs have a legal right to a jury trial if this case is not resolved or

disposed of by motion.

12. This Court has personal and subject matter jurisdiction over this matter.

13. Venue is proper in this county.

## GENERAL ALLEGATIONS

14. In 2016, David Windhurst was an inmate at the Arizona Department of Corrections ("ADOC"), Inmate #288503.

15. He was housed at the Arizona State Prison Complex in Florence ("ASPC-F) in the beginning of the year and ASPC-T in the latter part of the year.

16. At the time of his incarceration, David Windhurst was medically fragile, having a high thoracic spinal cord injury with bilateral above-the-knee limb amputation, with his left hip having been fully disarticulated (amputation through the hip joint).

17. At the time of his incarceration, David Windhurst had multiple complex medical issues including, but not limited to, pressure ulcer wound care/management with a history of chronic pressure ulcers in his perineum and sacral areas; suprapubic catheter care, infectious prevention and management; Type I diabetes mellitus (insulin dependent); anemia; hypertension; chronic kidney disease; chronic pan, neuropathy; alterations in bowel function due to multiple skin flap procedures resulting in the relocation of his rectum; muscle spasms; and hypothyroidism.

18. Consistent with the ADOC Department Manual, Chapter 1100, the ADOC assumed responsibility for the delivery of "appropriate and uninterrupted healthcare" for David Windhurst to manage these various complex chronic conditions.

19. On February 6, 2016, the ADOC received a Critical Urine Culture Result of David Windhurst, which was positive for MRSA, Methicillin Resistant Staphylococcus Aureus.

20. Despite this Critical Urine Culture result, Defendants' agents and/or employees ignored the signs and symptoms and denied and/or delayed David Windhurst

from getting appropriate medical treatment.

21. It was not until February 27, 2016, over 21 days later, when David Windhurst's medical condition was critical that Defendants' employees and/or agents addressed his acute medical condition.

22. It was at this time that he was transported to Mountain Vista Medical Center in Phoenix.

23. When David Windhurst arrived at Mountain Vista Medical Center on February 27, 2016, he was severely septic and in acute respiratory and renal failure from MRSA.

24. At the time, he was intubated and placed on a ventilator.

25. David Windhurst remained at Mountain Vista Medical Center from February 27, 2016, to April 7, 2016, in the Intensive Care Unit for nearly his entire hospitalization.

26. Because he was so clinically deteriorated prior to the hospital transfer, he was unable to be weaned from the ventilator and had a tracheotomy tube placed on March 13, 2016.

27. Additionally, for similar reasons, the deterioration or tracheotomy affected his swallowing reflex and a feeding tube (PEG) was also placed.

28. On April 7, 2016, David Windhurst returned to the ADOC, and was placed in the ASPC-T unit.

29. Sometime in June 2016, his feeding tube was removed and in July 2016 the tracheotomy tube was removed.

30. In early September 2016, David Windhurst developed a rash on his chest and shoulders.

31. No specialist skilled in complex disease management was consulted nor were any labs ordered to assist in a differential diagnosis regarding the rash David Windhurst developed in early September 2016.

32. By October 30, 2016, David Windhurst reported feeling that he had “bugs” below his skin.

33. At this time, David Windhurst’s urine was described as light brown.

34. On November 10, 2016, a “lump” on the side of David Windhurst’s jaw was described as a “tumor like, hard raised, red and painful” area, and David’s mental status was described as confused.

35. On November 11, 2016, David’s urine tested positive via a urine dipstick for blood, white blood cells and protein from a sample described as cloudy, brown/pink urine, which was also described as dark-blood tinged urine.

36. Also on that day, David’s neck mass worsened.

37. Despite this, no lab studies to ascertain renal function or systemic infection status were ordered.

38. No connection was documented to suggest nurses were seeing symptoms consistent with renal failure and possible uremic pruritus.

39. No request for kidney or infectious disease specialist support was made.

40. On November 12, 2016, David complained of right ear pain and a lump on the side of his jaw.

41. By November 14, 2016, David’s eardrum ruptured with malodorous/purulent drainage and the lump was classified as lymphadenitis (swollen lymph node).

42. Despite the deterioration of David’s condition, no appropriate diagnostic tests and/or referral to physician specialists were made or ordered.

43. Also on November 14, 2016, David was described as “very pale” with a “glassy glaze” and “delusional.”

44. Despite David having an infected ear, infected lymph system, infected urine and unexplained body rash, no recommendation for physician diagnosis or intervention was made.

45. The nursing staff merely continued to document David's decline without appropriate intervention or advocacy.

46. In the early morning hours of November 15, 2016, David Windhurst's further clinical decline was noted as having decreased urine output, tea colored urine with signs and symptoms of dehydration, low blood pressure and low sugar levels.

47. On the afternoon of November 15, 2016, David's urine culture result showed large amounts of particularly resistant bacteria named Pseudomonas Aeruginosa, often associated with facility-acquired infections.

48. Despite the changes in David's mental status, his chaotic blood sugars, his need for IV fluids for poor intake and low urine output, no lab chemistry studies were ordered, intake and output balances were not scrutinized, weights were not taken, and specialists were not consulted.

49. David's clinical presentation in November 2016 was nearly identical to that experienced in February 2016 when David was diagnosed with acute respiratory failure and severe sepsis.

50. On November 16, 2016, David's blood sugar was dangerously low at 52 mg/dl.

51. After intervention, repeat blood sugars remained low at 55 mg/dl and 67 mg/dl.

52. Still no physician was called and no lab or other diagnostic tests were ordered.

53. At this time, David's right neck mass was now described as "greatly enlarged," his lips were documented as "very dry" and his nurses continued to describe David as "glassy eyed," and his urine output was described as "yellow with brown/pink clusters of tissue looking concretions."

54. Despite this, nursing staff continued to morbidly document David's clinical decline rather than intervene on his behalf as would be expected and required in their well-

understood role as patient advocate.

55. By 12:55 a.m. on November 18, 2016, ADOC staff stated that David "was not doing well," "had a hard time swallowing," and was "confused" with a slow reaction.

56. By 2:53 a.m. on November 18, 2016, David's lungs were so full of fluid that the nurse documented "[w]et rales were noted from the doorway."

57. On November 18, 2016, between 12:55 a.m. and 5:34 a.m., nurses attempted to reach the on-call Advanced Practice Registered Nurse ("APRN") and physician six times, without response.

58. At 5:34 a.m., the doctor working for Defendants did not come in and assess David but merely ordered 40 mg of IVP Lasix for a patient whose last documented blood pressure was 86/47.

59. On November 18, 2016, at 5:54 a.m. David coded.

60. At that time, he was transported to Banner University Medical Center – South Campus ("BUMC").

61. Upon arrival at BUMC, David was diagnosed with uroseptic shock, renal failure, anemia and oropharyngeal (mouth and throat) ulcerations.

62. The cause of David's sepsis was documented as probable from infected urinary catheter or the decubitus ulcers. He was also diagnosed with bilateral pneumonia.

63. From November 18, 2016, to December 25, 016, David endured an extensive hospital course at BUMC that included multiple ICU stays.

64. David was deemed clinically unable to undergo conscious sedation anesthesia to have a feeding tube (PEG) tube placed again in his abdomen, thought to be related to his previous protracted hospital stay for respiratory failure and severe sepsis.

65. On December 25, 2016, while still at BUMC, David Windhurst died approximately one month before his scheduled release from the ADOC.

**COUNT ONE**

**(WRONGFUL DEATH:A.R.S. §12-611, *et seq.;***
**MEDICAL MALPRACTICE: A.R.S. §12-561, *et seq.)***

66. Antoinette Windhurst is a wrongful death claimant pursuant to A.R.S. §12-612(A).

67. Defendants have a non-delegable duty for the care, custody and control of inmates within the Arizona State Prison Complex system.

68. Defendants' non-delegable duty includes adequate medical care.

69. Defendants also have a statutory duty to provide adequate medical care pursuant to A.R.S. §31-201.01.

70. Defendants were required to provide care to David Windhurst commensurate with what would be available in the community.

71. The standard of care required that David receive more than just monitoring of his decline into severe sepsis from systemic and persistent mismanagement of his diabetes, kidney disease, wound care, peptic ulcer disease and other chronic conditions.

72. Despite David's multiple and complex chronic conditions, Defendants consistently and improperly delegated his care to family practice nurse practitioners with limited oversight from family practice or necessary specialist physicians.

73. Defendants engaged in systematic repetitive negligent care.

74. Defendants had a duty to David, breached their duty, and caused David's death by failing to provide appropriate assessment, intervention, and timely transfer to the acute-care setting.

75. Defendants also consistently violated the Nurse Practice Act and Arizona regulations requiring advanced practice registered nurses to refer a patient to a physician and consult with other healthcare providers when a condition is beyond the APRN's knowledge and experience in direct violation of A.R.S. §§32-1601 and 32-1606; and

Arizona Administrative Code R4-19-508.

76. Under A.R.S. §31-201.01, Charles Ryan was required to provide medical and health services to prisoners.

77. The ADOC, through Charles Ryan, further promulgated a policy stating that "the assistant director for ADC Health Services Contract Monitoring Bureau shall hold the contract providing health services accountable to ensure all inmates are provided access to scheduled and emergency (as needed) healthcare." The policy also required that "appropriate and uninterrupted healthcare be provided to inmates with chronic health conditions."

78. David Windhurst did not receive appropriate chronic healthcare commensurate with his complex medical management needs. His various chronic conditions collectively required consistent specialist oversight for safe management, which did not occur.

79. David Windhurst never received an infectious disease specialist consult even when experiencing a rash over 60% of his body, a ruptured eardrum and acute mass in the area of his parotid gland, purulent drainage from his decubitus wounds, and significant antibiotic resistant urine cultures.

80. David Windhurst was not even afforded regular face-to-face family practice physician visits. Instead, his complex care was entirely mismanaged by nurses and family nurse practitioners outside of the appropriate scope of practice.

81. Defendants failed to follow state law and its policies and procedures related to inmate healthcare to ensure adequate healthcare and access to emergency healthcare for David Windhurst. These failures fell below the standard of care.

82. Defendants are liable for the acts and omissions of their employees and/or agents acting within the course and scope of their employment or contract.

83. Defendants, each of them, breached the applicable standard of care they owed

to David Windhurst by failing to provide adequate medical treatment to him.

84. Defendants, through their employees and/or agents, failed to exercise that degree of care, skill and learning that would be expected under similar circumstances of a reasonably prudent healthcare provider within this State in negligently monitoring, evaluating, and treating David Windhurst.

85. Defendants' breach of the applicable standard of care directly and proximately caused David Windhurst's death; and, thus, injury to Plaintiffs.

**COUNT TWO**

**(ADULT PROTECTIVE SERVICE ACT ["APSA"]: A.R.S. §46-451 *et seq.*)**

86. Plaintiffs allege and incorporate all prior paragraphs herein.

87. Defendants are each an enterprise, as defined by A.R.S. §46-455(Q), that assumed a legal duty to provide care to David Windhurst.

88. David Windhurst was a "vulnerable adult" as defined by A.R.S. §46-451(A)(9) when he was at the ASPC-F and ASPC-T in 2016.

89. David Windhurst was injured by Defendants' negligent acts or omissions.

90. Defendants were independently negligent and also derivatively negligent for the acts of their employees and/or agents.

91. Injury to a vulnerable adult caused by negligent acts or omissions constitute "abuse" under A.R.S. §46-451(A)(1)(b).

92. Antoinette Windhurst has standing to bring this APSA claim, pursuant to A.R.S. §46-455(B) and A.R.S. §46-455(O).

93. Defendants' conduct here constitutes an "evil mind" pursuant to RAJI (Civil) Personal Injury Damages 4, such that Plaintiff is entitled to punitive damages. See A.R.S. §46-455(H)(4).

**COUNT THREE**
**(PUNITIVE DAMAGES)**

94. Plaintiffs allege and incorporate all prior paragraphs herein.

95. Defendant Ryan is an official policymaker responsible for promulgating appropriate policies and procedures at the ASPC-F and the ASPC-T.

96. Defendants operated the ASPC-F and the ASPC-T in a manner in which he knew or should have known that David Windhurst would suffer physical harm.

97. Defendants pursued a course of conduct knowing or having reason to know that it or they created a substantial risk of significant harm to David Windhurst so as to justify an award of punitive damages.

98. Defendants consciously and deliberately disregarded David Windhurst's interests and rights.

99. As a direct and proximate result of the aforementioned negligence, reckless and intentional acts, David Windhurst died.

WHEREFORE, Plaintiffs ask this Court to enter judgment in her favor and against Defendants as follows:

a. For wrongful death damages recoverable by RAJI (Civil) 5th Personal Injury Damages 3, A.R.S. §§12-613, 46-455(H)(4), and applicable law;

b. For all APSA damages recoverable by A.R.S. §46-455(H).

c. For punitive damages pursuant to RAJI (Civil) 5th Personal Injury Damages 4, A.R.S. §46-455(H)(4), and applicable law.

d. For costs in accordance with A.R.S. §§12-332 and 46-455(H)(4).

e. For such other and further relief as the Court deems just and proper.

. . .

Dated December 22, 2017.

MESCH, CLARK ROTHSCHILD, P.C.

By *s/Michael J. Crawford*
Michael J. Crawford
Attorneys for Plaintiffs

24V5300.DOCX